IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DOUGLAS THOMPSON, | ) | CASE NO. 5:13-cv-00917 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Douglas Thompson ("Plaintiff" or "Thompson") seeks judicial review of the

final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties. Doc. 14.   For the reasons set forth below, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

Thompson protectively filed applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on January 28, 2009.[1]  Tr. 113-116, 162-168, 169-171,

222.  He alleged a disability onset date of July 1, 2008 (Tr. 162, 169, 222), and claimed disability

based on deteriorating disc disease (Tr. 117, 124, 226).  After initial denial by the state agency

(Tr. 113-114, 117-123), and denial upon reconsideration (Tr. 115-116, 124-128), Thompson

---

[1] Protective filing is a Social Security term for the first time you contact the Social Security Administration to file a claim for disability or retirement. Protective filing dates may allow an individual to have an earlier application date than the actual signed application date. This is important because protective filing often affects the entitlement date for disability and retirement beneficiaries along with their dependents.
http://www.ssdrc.com/disabilityquestionsmain20.html.

requested a hearing (Tr. 109-112).  On July 26, 2011, Administrative Law Judge Barbara Sheehe ("ALJ") conducted an administrative hearing.  Tr. 39-65.

In her November 10, 2011, decision, the ALJ determined that Thompson had not been under a disability from July 1, 2008, the alleged onset date, through the date of the decision. Tr. 20-38.  Thompson requested review of the ALJ's decision by the Appeals Council.  Tr. 15-19. On March 5, 2013, the Appeals Council denied Thompson's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.    Personal, educational and vocational evidence

Thompson was born in 1978.  Tr. 44-45, 162, 169, 222.  He was 33 years old at the time of the hearing.  Tr. 45.  He has never been married.  Tr. 343.  He has three minor children that live with their mother.  Tr. 343.  Thompson lives with his mom.  Tr. 51.  He worked in the past as a general laborer and stopped working on July 1, 2008, his alleged onset date.  Tr. 226-227. As a general laborer, Thompson performed various jobs, including loading and unloading trucks, running machinery, and performing general housekeeping work.  Tr. 55-59, 227.   He completed high school and one year of college in 2004.  Tr. 45, 230.

### B.    Medical evidence[2]

#### 1.  Treatment history

Beginning as early as 2006 through 2008,[3] Thompson received treatment through the Family Health Center ("FHC") in both Ohio and Michigan for reported back pain.  Tr. 266-310.

---

[2] Although Thompson alleged disability based on both mental and physical impairments, his arguments pertain to his alleged physical impairments.  Doc. 17.  Accordingly, the medical evidence summarized herein relates to Thompson's alleged physical impairments.

[3] The last FHC treatment note appears to be dated June 24, 2008.  Tr. 291-294.  During that visit, Thompson presented with complaints of a sore throat.  Tr. 291-294.  Prior to that, on June 3, 2008, Thompson was seen for his back pain.  Tr. 280.

During a May 9, 2008, [4] visit with Dawn Ackerman, RN, PA-C, at the FHC, Thompson reported that he was living at a mission and/or at a friend's house and was unemployed.  Tr. 282. He reported that he was continuing to have low back pain that radiated occasionally down his left leg but noted that there were days when his back did not bother him as much.  Tr. 282.  On examination, Thompson was extremely tender over the SI joint primarily on the left and he had tenderness to palpation along the lumbar paraspinous musculature.  Tr. 282.  Straight leg raises were negative and his strength was 5/5.  Tr. 282.   Ms. Ackerman assessed Thompson with chronic low back pain with sciatica of the left lower extremity.  Tr. 282.  Thompson noted that he had smoked marijuana about three weeks prior but was not using any further and intended to stop completely.  Tr. 282.  Thompson was "re-signed to [a] narcotics contract" and a urine drug screen was performed. [5]  Tr. 282.  Ms. Ackerman prescribed Vicodin and Flexeril.  Tr. 282.

On June 3, 2008, Thompson saw Ms. Ackerman for his low back pain and sciatica.  Tr. 280.  He reported that his mother had passed away.  Tr. 280.  He indicated that he had been sleeping better with the Flexeril and was doing really well with the Vicodin.  Tr. 280.  He reported, however, that he had run out of Vicodin and his pain had gotten worse over the prior 24 hours.  Tr. 280.  During the examination, Ms. Ackerman noted that Thompson was standing; he was very uncomfortable sitting; he was rocking on the balls of his feet to ease his pain.  Tr. 280. Thompson was tender in his lumbar musculature.  Tr. 280.  Ms. Ackerman assessed chronic low back pain with sciatica and refilled Thompson's Vicodin and Flexeril.  Tr. 280.

---

[4] A May 9, 2008, FHC Michigan treatment note reflects that Thompson had returned to the area from Ohio where he had been taking care of his mother who had cancer.  Tr. 282.  An April 16, 2008, treatment note reflects that Thompson reported that he had been without pain for a while and was working at a factory.  Tr. 295. A musculoskeletal exam showed "TENDER SPINOUS PROCESSES. Full range of motion.  Normal rotations. STABLE.  Normal strength and tone."  Tr. 295.

[5] The drug test was positive for marijuana.  Tr. 277.

On September 10, 2008, Thompson presented to the Wooster Community Hospital Emergency Department ("WCH ER") with complaints of back pain.  Tr. 316.  Thompson reported that he had been in pain management in Michigan for his back.  Tr. 316.  He indicated that the back pain that he was experiencing was similar to his prior back pain.  Tr. 316.  He reported that his back pain had gotten worse the day before.  Tr. 316.  His pain was worse when standing and he got relief by bending his knees.  Tr. 316.  He denied numbness, tingling or weakness in his leg.  Tr. 316.  On examination, he had no vertebral tenderness to palpation but he did have moderate tenderness to palpation over his left sciatic notch.  Tr. 316.  Thompson had a negative straight leg raise bilaterally; 5/5 dorsiflexion, plantar flexion, extensor halluces longus bilaterally; 2+ and symmetric patellar and Achilles tendon reflexes bilaterally; and normal sensation to light touch throughout.  Tr. 316.  Thompson was given prescriptions for 10 Vicodin, Flexeril and Naproxen and he was advised to follow up with Dr. Ayman Basali in 2 days.[6]  Tr. 316-317.

Three days later, Thompson presented at the WCH ER reporting that he had been doing ok until that evening.  Tr. 314.  He stated that he turned the wrong way and began having worse pain on the left side of his back.  Tr. 314.  He reported that his entire left leg, back and sides were numb.  Tr. 314.  Thompson indicated that he had an appointment scheduled with Dr. Basali in 3 days.  Tr. 314.  On examination, Thompson had mild diffuse tenderness to palpation over his lumbar spine and left sciatic notch.  Tr. 314.  He had a negative straight leg raise bilaterally; 5/5 dorsiflexion, plantar flexion, extensor halluces longus bilaterally; 2+ and symmetric patellar and Achilles tendon reflexes bilaterally; and decreased sensation to light touch in the lateral left foot.

---

[6] Dr. Basali is a physician with the Pain Management Institute at Wooster Community Hospital.  Tr. 421.

Tr. 314.  The WCH ER doctor noted that an OARRS[7] report showed that Thompson had had 3 prescriptions for narcotic medication in the past year and a number of emergency department visits during the current month.  Tr. 314.  Since Thompson had reported that he was scheduled to see Dr. Basali in 3 days, the emergency room doctor gave Thompson a  prescription for 15 Vicodin.  Tr. 314.

A month later, however, on October 24, 2008, Thompson presented again to the WCH ER not having seen Dr. Basali.  Tr. 313.  Thompson indicated that Dr. Basali would not see him unless he paid him $130.00, which he did not have.  Tr. 313.  Thompson stated that he had fallen down the steps the day before and aggravated his back.  Tr. 313.  On examination, Thompson had some tenderness to palpation diffusely over the left lumbar paraspinal musculature; negative straight leg raises; deep tendon reflexes were +2/4 equal bilaterally at the patella and Achilles; normal L5 extension; he was able to stand and ambulate without difficulty; and there was no external evidence of trauma such as bruising.  Tr. 313.  The emergency room doctor indicated, "At this point, he stated that in Michigan he was getting Flexeril and Vicodin 7.5 for his pain.  I explained to him that for chronic pain I would not write him for narcotics."  Tr. 313.  The emergency room doctor offered him prescriptions for Ultram, Flexeril and Naprosyn and a referral to a primary care physician.  Tr. 313.

Thompson continued to seek treatment at the WCH ER for complaints of back pain through May 2009.[8]  Tr. 311 (12/10/2008), 331 (1/4/2009), 330 (1/11/2009), 328-329 (2/26/2009), 326-327 (3/9/2009), 325 (4/16/2009).  During his January 11, 2009, WCH ER visit,

---

[7] "OARRS" is the Ohio Automatic Rx Reporting System. *See* Ohio Administrative Code § 4731-11-11(A)(1); *see also* Tr. 428 (referring to an OARRS report); Tr. 432 (referring to the Ohio Automatic Reporting System Survey).

[8] He also presented to the emergency room for complaints of pain not associated with his back.  Tr. 324.  For example, on April 22, 2009, Thompson presented to the WCH ER with complaints of tooth pain and an inability to see a dentist until the following Monday.  Tr. 324.

Dr. Wright, the emergency room doctor, assessed Thompson with acute left sciatica and acute chronic pain syndrome.  Tr.  330.  He noted that Thompson had been unable to get his pain medication filled because he did not have insurance or financial resources.  Tr. 330.  Dr. Wright suggested that Thompson follow up with doctors at the Startzman Clinic.  Tr. 330.  During a March 9, 2009, WCH ER visit for complaints of back pain, Dr. Lofgren, the emergency room doctor, reminded Thompson that he had been advising him that he had chronic pain and needed to be seen by a pain management specialist.  Tr. 326.  Thompson indicated that he had a referral to Dr. Blankenhorn but he was waiting for his records from Michigan.  Tr. 326.  Dr. Lofgren reminded Thompson that Thompson had been saying that for almost a year and advised Thompson that he would provide him with a prescription for 15 Vicodin but would not treat him again with narcotics.  Tr. 326.  Thompson was instructed again to follow up with the Startzman Clinic.  Tr. 326.  However, on April 16, 2009, Thompson returned again to the WCH ER stating he had run out of Vicodin and Flexeril.  Tr. 325.  On examination, Thompson showed localized tenderness at L4, L5 with referral pain at the left gluteal region, no radiculopathy; no root pain; no CVA tenderness; and he was able to ambulate with difficulty.  Tr. 325.  Dr.  Gunduz, the ER physician, discharged Thompson with a prescription for Vicodin and Flexeril and instructed him to follow up with a Dr. Jonathan Kase or his family doctor.  Tr. 325.

In May 2009, Thompson was in jail on drug and domestic violence charges.  Tr.  234, 334-341.  As part of the mental health and substance abuse interview, the prison counselor noted that Thompson "catastrophized about all of his many medical issues."  Tr. 341.  He indicated he would be paralyzed if he moved the wrong way because of a herniated disc and that it was likely that he would have a heart attack while in jail because of his increased anxiety.  Tr. 341.

On November 1, 2009, Thompson saw Mark J. Tereletsky, D.O., with complaints of lower back pain.  Tr. 373.    Thompson reported that his lower back pain shoots into his left leg. Tr. 373.  He indicated that he had fallen down the stairs.  Tr. 373.  Dr. Tereletsky noted that Thompson had tenderness to palpation over his left SI joint area.  Tr. 373.   Thompson had good range of motion.  Tr. 373.  Dr. Tereletsky prescribed 30 Vicodin and Soma.  Tr. 373.  Thompson returned to see Dr. Tereltsky on December 8, 2009, with continued complaints of back pain and continued pain down his left leg.  Tr. 372.  Thompson was seeking a refill of medication.  Tr. 372.  Dr. Tereltsky noted that Thompson had a decreased range of motion in lumbar spine.  Tr. 372.  Thompson thought he had had an MRI but could not say where it was done.  Tr. 372.  Dr. Tereltsky decided to keep Thompson on small amounts of Vidodin for the pain and to continue with Soma and NSAIDs.[9]  Tr. 372.

During 2010, Thompson continued to seek treatment at various emergency rooms including, Dunlap Community Hospital, Wadsworth-Rittman Hospital, WCH, and Summary Health System Barberton Hospital, for his low back pain.[10]  Tr. 394 (12/30/2010), 395-398, 465-466  (12/20/2010),[11] 401 (12/13/2010), 428-429 (11/30/10),[12] 430-431 (11/2/2010), 432-433

---

[9] A May 24, 2010, physical examination note from Dr. Robert F. Lindsay, D.O., indicates that Thompson had seen Dr. Tereletsky in the past but had been dismissed.  Tr. 387; *see also* Tr. 404 (6/21/2010 Dunlap Community Hospital emergency department note).

[10] Additionally, Thompson sought emergency room treatment for other issues, including dental pain in January 2010 (Tr. 438) and a rash in December 2010 (Tr. 399).

[11] Thompson presented to the ER with complaints of shoulder pain and exacerbation of back pain following a fall. Tr. 465.  On physical examination, Thompson showed "[n]o spinous process tenderness over the cervical, thoracolumbar or sacral areas.  Mild paraspinal discomfort of the L4-L5 area.  Straight leg raise negative . . . Good range of motion of the shoulder, elbow and wrist.  5/5 grip.  Nonantalgic."  Tr. 465.

[12] Thompson was given a prescription for Percocet, Motrin and Flexeril and advised to follow up with his doctor. Tr. 428.  However, Dr. Louis Horwitz, M.D., the attending physician, noted that he had reviewed Thompson's OARRS report and it was concerning.  Tr. 428.  Dr. Horowitz noted that the OARRS report reflected that, during the prior year, Thompson had used 5 different addresses and had received 40 different prescriptions for narcotics from 13 different doctors and 6 different pharmacies.  Tr. 428.

(9/26/2010),[13] 434 (9/9/2010), 439-444 (9/7/2010), 403 (8/30/2010), 409-414 (8/8/2010),[14] 435 (7/16/2010), 404-405 (6/21/2010), 436-437 (5/6/2010), 438 (1/3/2010).

In 2010, Thompson also received treatment from physicians at the Family Practice Center (FPC).  Tr. 381-390.  On May 24, 2010, Thompson saw Dr. Robert F. Lindsay, D.O., of the FPC for problems with swallowing and vomiting.  Tr. 387.  During that visit, Thompson reported that he had an appointment scheduled with Dr. Blankenhorn in July 2010 for pain management.  Tr. 387.  Dr. Lindsay advised Thompson to keep his appointment with Dr. Blankenhorn because Dr. Lindsay no longer treated chronic pain with narcotics.  Tr. 388.  On August 20, 2010, Thompson saw Dr. Lindsay following his emergency room visit for having fallen off a ladder and having been advised that he might have fractured a rib.  Tr. 385.  Thompson indicated that he had not met with Dr. Blankenhorn because he had a court date.  Tr. 385.  Thompson requested and received a new referral for Dr. Blankenhorn.  Tr. 385-386.  He also received a prescription for Percocet.  Tr. 386.

On September 13, 2010, Thompson also saw pain management specialist Ayman H. Basali, M.D., regarding his chronic back condition.  Tr. 421-427.  Thompson informed Dr. Basali that he had been treated by Dr. Tereletsky who treated him with epidural injections, Vicodin and anti-inflammatory medication.[15] Tr. 423.  Thompson reported that his pain was getting worse with dull, aching sensation in his lower lumbar region, varying in intensity between a 3 to 10 out of 10.  Tr. 423.  He indicated that his pain increased with standing, lifting,

---

[13] Thompson reported chronic back pain and indicated that his pain was worse because his 6-year old daughter jumped on him, straining his back.  Tr. 432.  The attending physician, Dr. Lisa Darenek M.D., noted that she did not feel comfortable writing Thompson any prescriptions for narcotic because he had multiple prescriptions from multiple emergency rooms for pain.  Tr. 432.

[14] Thompson reported falling off a 6-foot ladder while retrieving a kitten out of a tree.  Tr. 409.

[15] Thompson indicated the he had moved out the state and therefore stopped treatment with Dr. Tereletsky.  Tr. 423.  Thompson reported that he was under the care of out an of state pain physicians.  Tr. 423.

walking, bending or doing any other kinds of activity; his activities of daily living had gradually

decreased; and his sleeping pattern was interrupted because of the pain.  Tr. 423.   Thompson

also indicated that he was unable to do physical therapy because of the pain.  Tr. 423.  He

reported muscle weakness, muscle pain, and decreased range of motion.  Tr. 422.  On

examination, Thompson showed limited range of motion with flexion and extension movement

with diffuse paraspinal facet tenderness; straight leg raising was negative; flexion, abduction and

external rotation was negative.  Tr. 422.  Thompson had no dermatomal or sensory deficits and

no focal motor deficits.  Tr. 424.   Dr. Basali assessed degenerative disk disease lumbar; facet

syndrome lumbar; and radicular syndrome lower extremity.  Tr. 424.  He recommended an MRI

of the lumbar spine and prescribed Mobic and Zanaflex but no scheduled medications.  Tr. 424.

> The September 17, 2010, lumbar spine MRI showed:
>
> L5-S1 annular bulge with midline and right paracentral disk protrusion and accompanying endplate spondylosis, with impingement on the descending right S1 nerve root, without compressive intervertebral neural foraminal narrowing.
>
> L4-5 annular bulge, posterior central and right intraforaminal disk protrusions, endplate spondylosis and right greater than left facet arthrosis, resulting in compressive bilateral lateral recess encroachment and moderate right intervertebral neural foraminal narrowing.
>
> L3-4 annular bulge with posterior central disk protrusion and mild endplate spondylosis, with mild bilateral lateral recess encroachment, without compressive intervertebral neural foraminal narrowing.
>
> T11-12 posterior right paracentral disk protrusion, imaged in sagittal plane only. Cosider further assessment with axial imaging through this level of dedicated thoracic spine MRI, as clinically warranted.

Tr. 406-408, 445-447.

On September 22, 2010, Thompson saw Dr. Deanne E. McCarroll, D.O., of the FPC.  Tr.

383.  Thompson reported that he had been hit by a car on September 18, 2010, when he was

walking to get mail.  Tr. 383.  He stated that he was hit on the back of his right knee and hit the

hood of the car and rolled.  Tr. 383.  The car was going 15-20 mph.  Tr. 383.  He did not file a police report and he did not go to the emergency room.  Tr. 383.  He thought he was fine but it kept hurting and hurting.  Tr. 383.  Dr. McCarroll noted that Thompson's story was questionable because his past medical history showed that he had already been to the emergency room on three other occasions in September 2010 and had a hard time answering why he did not go after being hit by a car.  Tr. 383.  Dr. McCarroll recommended that Thompson continue with ice and heat on his knee and stretching.  Tr. 384.  She also recommended that he continue the Mobic that Dr. Basali had prescribed for him for anti-inflammatory effects.  Tr. 384.  On September 30, 2010, Thompson returned to the FPC for a check-up following a September 24, 2010, emergency room visit.  Tr. 318-382.  He saw Dr. Douglas R. Brown, D.O.  Tr. 381-382.  Thompson reported that he was scheduled to see Dr. Basali the following week and also indicated that the Zanflex that Dr. Basali had prescribed was not working at all and he was having quite a bit of pain in his back.  Tr. 381.  On examination, Thompson's range of motion was decreased.  Tr. 381.  Dr. Brown prescribed Percocet but noted that Thompson was told that no more pain medication would be dispensed.  Tr. 382.

Thompson did not see Dr. Basali again but, on November 17, 2010, he saw pain management specialist Dr. Daniel Lynch, M.D.  Tr. 502-504.  On examination, Thompson had a mildly antalgic gait with left limp; his posture was poor with moderate round shoulders and forward stoop; and his range of motion was significantly reduced with respect to extension, moderately reduced with flexion and mildly reduced with lateral tilt and rotation.  Tr. 502.  Provocative testing was positive for facet arthritis, left Si joint arthropathy while his lower left extremity was approximately 1.5 cm shorter than his right side.  Tr. 502.  Neurological testing was grossly normal in testing nerve roots L1-S2 for any sensory or motor deficits and deep

tendon reflexes were normal except at his left knee.  Tr. 502.  Dr. Lynch advised Thompson that

Dr. Lynch intended to employ minimal narcotic management and explained that all pain

medication were to be written by Dr. Lynch.  Tr. 503.  Dr. Lynch recommended various

treatment, including medication, steroid injections, and a consultation for physical therapy.  Tr.

503.

On December 7, 2010, Thompson received a lumbar epidural injection (Tr. 400) and, on

January 1, 2011, he received a caudal epidural injection (Tr. 393).  Following his injections, on

February 2, 2011, Thompson saw Dr. Lynch.  Tr. 463-464.  Dr. Lynch noted that Thompson

"certainly has reason for having significant lower back pain."  Tr. 464.  Dr. Lynch indicated that,

based on Thompson's MRI from the prior year, Thompson had a herniated nucleus pulposus at

the L3-4, L4-5, and L5-SI levels along with effacement of the L5 and S1 nerve roots.  Tr. 464.

Because medication management and injections had given Thompson only temporary relief, he

provided Thompson with the names of orthopedic spine surgeons.  Tr. 464.  Dr. Lynch also

noted that he explained to Thompson that he would not escalate his opioid medication any

further but that, in the event of flare-ups, an emergency room visit might be his only option.  Tr.

464.

Thompson had a second lumbar spine MRI performed on February 17, 2011.  Tr. 505-

507.  The MRI showed (1) disc protrusions at L3-4, L4-5 and L5-S1 with degenerative disc

disease and disc dehydration; (2) no foraminal stenosis or significant central canal stenosis; and

(3) mild facet arthritis in the lower lumbar spine.  Tr. 506.  Also, during 2011, Thompson

continued to receive treatment at emergency rooms for his low back pain.[16]  Tr. 477-483

---

[16] He also presented to the emergency room for a rash.  Tr. 490-495.

(1/17/2011),[17] 469-475 (1/19/2011), 456-462 (2/23/2011),[18] 449-455 (3/9/2011),[19] 497-501

(5/8/2011),[20] 484-485 (5/17/2011).

On July 20, 2011, Glenn D. Blankenhorn, D.O., saw Thompson for a consultation with

respect to Thompson's complaints of low back pain.  Tr. 510-11.  Thompson reported having had

low back pain for six years.[21]  Tr. 510.  He described his pain as being constant with stabbing,

stinging, pins and needles in his lower extremities that was exacerbated by activity and lessened

by pain medication.  Tr. 510.  Thompson reported having had multiple evaluations along with an

MRI and being diagnosed with multilevel disc disease with herniations and stenosis.  Tr. 510.

An orthopedic consult had occurred but surgery was not recommended.  Tr. 510.  Thompson had

been referred to pain management and started on Vicodin.  Tr. 510.  He underwent physical

therapy trials and epidural injections with poor relief.  Tr. 510.  Thompson had also tried

neuroactive medications and NSAIDS.  Tr. 510.  He had not been given a trial of TENS or

educated in guided imaging.  Tr. 510.

Dr. Blankenhorn indicated that, on physical examination, Thompson "does have

paraspinal muscle facilitation and some segmental restrictions. 2+ biceps, triceps, brachioradialis

deep tendon reflexes and 1+ patella, and 1+ Achilles bilaterally. Negative SLR, Lasegue, and

bowstring.  No lower extremity muscular atrophy or fasciculations.  He has normal appearing

---

[17] Thompson presented to the emergency room indicating that his pain was so bad that he passed out.  Tr. 477.

[18] Thompson complained of worsening back pain.  Tr. 456.  He had been moving a heavy object.  Tr. 460.  The emergency room physician spoke with Dr. Lynch who advised that Thompson had a "surgical back" and did not feel that increasing pain medication would help.  Tr. 456.

[19] Thompson reported that he had slipped, making his back pain worse.  Tr. 449.

[20] Thompson reported that Dr. Lynch had advised him that Dr. Lynch was unable to help him anymore and that Thompson would have to go to the emergency room for pain medicine until he was able to find another doctor.  Tr. 499.

[21] He could not identify a specific event that caused his low back pain but noted that he had been in a motor vehicle accidence in 1997; was a mixed martial art fighter; and performed heavy factory work until 2007.  Tr. 510.

gait and localizes well to light touch." Tr. 510.  Dr. Blankenhorn noted that he had reviewed the multiple reports of imaging and Thompson did have "multiple level disc disease with a disc protrusion and end-plate spondylosis at L5-S1 with S1 root impingement." Tr. 510.

Dr. Blankenhorn opined that Thompson had: (1) chronic pain syndrome; (2) degenerative joint and disc disease; (3) lumbar disc herniation; and (4) possible radiculopathy. Tr. 510.  Dr. Blankenhorn's plan included putting Thompson on a pain contract and continuing with his pain medications and doing an OARRS review the day prior to prescribing. Tr. 510-511.  He also recommended trials of TENS, lumbar traction, and a possible follow up with electrodiagnostic evaluation and education in guided imaging. Tr. 511.  Dr. Blankenhorn stated that Thompson should be seen again in two weeks. Tr. 511.

### 2. Opinion evidence

#### a. Treating physician

After seeing Thompson for a consultation on July 20, 2011, Glenn D. Blankenhorn, D.O., on August 3, 2011, completed a Medical Source Statement regarding Thompson's ability to perform certain physical activities. Tr. 508-509.  Dr. Blankenhorn opined that Thompson was (1) limited to lifting/carrying up to 10 pounds occasionally and up to 2 pounds frequently; (2) limited to standing/walking a total of 30 minutes during an 8-hour workday and for 15 minutes without interruption; (3) limited to sitting for a total of 1 hour during an 8-hour workday and for 1 hour without interruption; (4) rarely or never able to climb, balance, stoop, crouch, kneel or crawl; (5) rarely or never able to push/pull; occasionally able to reach; and frequently able to handle, feel, and perform fine or gross manipulation; and (6) unable to be exposed to heights and temperature extremes. Tr. 508-509.  Dr. Blankenhorn further opined that, in addition to a morning, lunch and afternoon break, Thompson would require additional breaks and Thompson

would need an at-will sit/stand option.  Tr. 509.  Dr. Blankenhorn indicated that Thompson had

been prescribed a brace and TENS unit and he described Thompson's pain as severe.  Tr. 509.

### b.  Consultative examining physician

On March 13, 2009, Perry Williams, M.D., completed a Basic Medical form, including

exam findings and a "physical functional capacity assessment."[22]  Tr. 375-376.  Dr. Williams

noted that Thompson's extremities were within normal limits; his spine was tender at the lumbar

sacral spine, with decreased range of motion; and his joints were intact.  Tr. 376.  Dr. Williams

indicated that Thompson had degenerative disc disease of the lumbar spine.  Tr. 376.  He stated

that Thompson's health status was "poor but stable."  Tr. 376.  Dr. Williams ordered x-rays of

Thompson's lumbar spine.  Tr. 374.  Those x-rays showed:

> [N]ormal alignment of the lumbar vertebrae with mild loss of disk space at L4-L5.
> Note that there is a shallow AP diameter of the lumbar canal from L4 through S1
> which may represent a degree of lumbar canal stenosis, a finding which could be
> evaluated with CT or MRI.  Bone mineralization is normal.  There is no fracture
> of listhesis.

Tr. 374.  The impression was: "Degenerative disk disease at L4-L5.  Shallow AP diameter of the

lower lumbar canal."

In the "functional capacity assessment," Dr. Williams opined that Thompson was (1)

limited to stand/walking for a total of 2-4 hours in an 8-hour workday and for 1-2 hours without

interruption; (2) limited to sitting for a total of 3-6 hours in an 8-hour workday and for 1-2 hours

without interruption; (3) limited to lifting/carrying up to 20 pounds frequently and 25 pounds

occasionally; and (4) markedly limited in his ability to push/pull and bend.  Tr. 375.  Dr.

Williams indicated that Thompson's limitations were the result of the noted conditions. Tr. 375.

---

[22] The form completed by Dr. Williams is an Ohio Department of Job and Family Services form.  Tr. 375-376.  On
March 4, 2009, Thompson signed an Ohio Department of Job and Family Services form indicating that he agreed to
apply for SSI and he agreed that, if he received SSI, the State would be entitled to receive his SSI benefits in the
amount of reimbursable public assistance that the State had provided.  Tr. 182.

14

Dr. Williams checked a box indicating that Thompson was employable, noting with restrictions. Tr. 375.

### c. State agency reviewing physicians

On August 28, 2009, state agency reviewing physician Edmond Gardner, M.D., completed a Physical RFC Assessment. Tr. 363-370. Dr. Gardner opined that Thompson could occasionally lift and/or carry up to 50 pounds; frequently lift and/or carry up to 25 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push and/or pull, other than as shown for lift and/or carry. Tr. 364. Dr. Gardner opined that Thompson had no postural, manipulative, visual, communicative, or environmental limitations. Tr. 365-367. In discussing Thompson's alleged symptoms, Dr. Garnder stated,

> Allegations are partially credible. He alleges he is unable to do any lifting including a gallon of milk, however he is able to perform basic ADL's per his report. There is no evidence of radiculopathy and he is neurologically intact. The degree of limitations set forth by the clmt are disproportionate to the MER in file. He is able to walk, stand and move about in a normal manner. If his pain were as severe as he alleges, one would think he would seek alternative treatment or surgical intervention.

Tr. 368.

On March 30, 2010, W. Jerry McCloud, M.D., reviewed additional medical evidence, including medical records from Dr. Tereletsky, and concluded that there was no new medical evidence that would alter Dr. Gardner's August 28, 2009, RFC. Tr. 380. Thus, Dr. McCloud affirmed Dr. Gardner's August 28, 2009, RFC. Tr. 380.

## C. Testimonial evidence

### 1. Thompson's testimony

Thompson testified and was represented by counsel at the administrative hearing. Tr. 44-59. He indicated that he had been unable to work since July 1, 2008, because of constant pain.

Tr. 45, 55.  He has tried to work but cannot.  Tr. 55.  He indicated that he would miss too many days.  Tr. 55.  He stated, "I can't even get out of bed."  Tr. 55.

He described his pain as being located on the lower left side and middle of his back, with really bad shooting pain down into his left leg that causes numbness once or twice each day for about 30-40 minutes.  Tr. 46.  He stated that sitting or standing too long makes his back pain worse.  Tr. 46.  He can sit for about 25 minutes at a time and he can stand for about 30 minutes at a time before having to change positions.[23]  Tr. 46-47.  He occasionally uses a cane when he is feeling really bad to help prevent a fall.  Tr. 54-55.  He can walk for about 3 minutes at time.  Tr. 47.  Also, if he is lying down a certain way and turns to grab something, he will feel a twinge and then go numb and feel shooting pain.  Tr. 47.  He indicated that he is not sure that he could lift a gallon of milk.  Tr. 53-54.  He stated that his doctor advised him not to lift anything over a pound.  Tr. 54.  The most comfortable position for him is lying on his back with his left leg pulled up towards his body.  Tr. 47.  He stated that he is in that position for about 7 hours each day.  Tr. 47.  He reported that the pain is so bad sometimes that it causes him to go unconscious.  Tr. 45, 47-48.

Thompson indicated that he has tried everything to relieve the pain.  Tr. 45, 48.   He has tried physical therapy, epidural and cortisone injections, different types of pain killers and muscle relaxers.  Tr. 48.  However, he stated that nothing seems to totally eliminate the pain.  Tr. 48.  Shortly before the hearing, he started seeing Dr. Blankenhorn, a new pain management doctor.  Tr. 48-49.  He stated that it had taken him a while to get in to see Dr. Blankenhorn because of scheduling conflicts and insurance issues.  Tr. 49.  Thompson stated that Dr. Blankenhorn had switched him from Vicodin 500 to Percocet 750.  Tr. 49.  Also, Dr. Blankenhorn added Flexeril to try to alleviate Thompson's back spasms.  Tr. 49.  Thompson

---

[23] During the hearing, Thompson asked if he could stand for a moment.  Tr. 55.

indicated that his medication makes him very tired.  Tr. 49.  Some nights he is able to sleep through the night but, on other nights, the pain causes him to wake up after about one to three hours.  Tr. 49.  He is tired, groggy and slightly disoriented on days after he has not slept well. Tr. 49-50.  Dr. Blankenhorn was considering whether a TENS machine could help Thompson with his back spasms.  Tr. 50.  His doctors had advised him that there really were no other procedures for his back.  Tr. 50.  However, he noted that one doctor mentioned that Thompson could try fusion but that doctor also said that fusion would just put more pressure on the higher discs and cause them to deteriorate at a faster rate.  Tr. 50.

Thompson described a typical day as waking up, taking his medication, lying back down and watching a movie, getting up, checking on his mom, usually lying back down, trying to check the mail, and playing chess with a friend if a friend comes over.  Tr. 50.  He usually spends most of the day in his room reading books and watching television.  Tr. 50-51.  He is unable to help with the laundry but occasionally helps with the dishes if he is able to stand long enough.  Tr. 51.  He really does not drive but recently obtained his driver's license for emergencies.  Tr. 53.

Prior to having problems with his back, he was very athletic.  Tr. 51.  He enjoyed playing basketball and was a martial artist.  Tr. 51.  Thompson acknowledged using drugs and alcohol in the past but reported that he had not used marijuana for almost two years since he had been in pain management.  Tr. 51-52.  He drinks alcohol occasionally.  Tr. 52.

### 2.  Vocational Expert's testimony

Vocational Expert ("VE") Lynn Smith testified at the hearing.  Tr. 59-64.   The VE described Thompson's past work.  Tr.60.  She indicated that Thompson performed work as a

machine operator (a medium, unskilled job); hand packager (a medium, unskilled job), and cable assembler (a medium, skilled job).  Tr. 60.

The ALJ proceeded to ask the VE a series of hypotheticals.  Tr. 60-63.  For her first hypothetical, the ALJ asked the VE to assume a person of the same age, education and past relevant work experience as Thompson who can lift and carry 10 pounds frequently and 20 pounds occasionally; can sit, stand and/or walk for 6 hours in an 8-hour workday; can never climb ladders, ropes or scaffold; and can occasionally climb stairs and ramps. Tr. 60.  The VE indicated that the described individual would be unable to perform Thompson's past relevant work but there would be other jobs available that the individual could perform, including (1) assembler, a light, unskilled job with 1,500 positions available locally, 10,000 statewide, and 200,000 nationally; (2) ticket seller, a light, unskilled job with 7,000 positions available locally, 140,000 statewide, and 3.4 million nationally; and (3) fast food worker, a light, unskilled job with 4,000 positions available locally, 100,000 statewide, and 2.2 million nationally.  Tr. 61.

For her second hypothetical, the ALJ added that the individual described in the first hypothetical should also avoid all exposure to workplace hazards such as unprotected heights and dangerous machinery.  Tr. 61.  The VE indicated that the same jobs listed for the first hypothetical would remain available.  Tr. 61.

For her third hypothetical, the ALJ asked the VE to assume a person of the same age, education and past relevant work experience as Thompson who can lift and carry up to 5 pounds frequently and 10 pounds occasionally; can sit during the course of an 8-hour workday and stand and/or walk for 2 hours during the course of an 8-hour workday; should never climb ladders, ropes or scaffolds; and can occasionally climb stairs and ramps.  Tr. 61-62.  The VE indicated that, although the described individual would be unable to perform Thompson's past relevant

work, there would be other jobs available that the individual could perform, including (1) inspector, a sedentary, unskilled job with 1,500 positions available locally, 30,000 statewide, and 670,000 nationally; (2) order clerk, a sedentary, unskilled job with 1,000 positions available locally, 9,000 statewide, and 260,000 nationally; and (3) assembler, a sedentary, unskilled job with 1,300 positions available locally, 17,000 statewide, and 300,000 nationally.  Tr. 62.

For her fourth hypothetical, the ALJ added that the individual described in the third hypothetical should also avoid all exposure to workplace hazards such as unprotected heights or dangerous machinery.  Tr. 62.  The VE indicated that the same jobs listed for the third hypothetical would remain available.  Tr. 62.

For her fifth hypothetical, the ALJ added that the individual described in the third and fourth hypotheticals should be allowed a sit/stand option, which would entail the individual being off task a minute or two while changing positions.  Tr. 62-63.  The VE indicated that the described individual would remain able to perform the inspector job and order clerk job.  Tr. 63.  In addition, the VE indicated that the individual would be able to perform the job of ticket checker, a sedentary, unskilled job with 7,000 positions available locally, 70,000 statewide, and 1.8 million nationally.  Tr. 63.

For her sixth hypothetical, the ALJ added that, as result of the symptoms that the individual experiences, the individual described in the third, fourth and fifth hypotheticals would be off task 20% of the time or more.  Tr. 63.  The VE indicated that there would be no jobs available for the described individual.  Tr. 63.

For the final hypothetical, the ALJ asked the VE if there would jobs available for the individual if, instead of being off task 20% of the time, the individual would miss two or more

days of work per month. Tr. 63.  The VE indicated that there would be no jobs available for the described individual.  Tr. 63.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[24] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant

---

[24] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[25] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her November 10, 2011, decision, the ALJ made the following findings:[26]

1.  Thompson meets the insured status requirements through June 30, 2013. Tr. 25.

2.  Thompson has not engaged in substantial gainful activity since July 1, 2008, the alleged onset date.  Tr. 25.

3.  Thompson has the following severe impairments: extensive folliculitis; obesity; degenerative disc disease, lumbar disc herniation, and low back syndrome.  Tr. 25.  Thompson's medically determinable impairments of bipolar disorder, rule-out anti-social personality disorder, and alcohol and cannabis abuse, considered singly or in combination, do not cause more than minimal limitation in Thompson's ability to perform basic mental work activities are and therefore are not severe.  Tr. 25-26.

4.  Thompson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 26-27.

---

[25] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[26] The ALJ's findings are summarized.

5.    Thompson has the RFC to perform sedentary work except that he may occasionally climb ramps and stairs, but may never climb ladders, ropes or scaffolds; he must avoid all exposure to workplace hazards, such as unprotected heights and dangerous moving machinery.  Tr. 27-31.

6.    Thompson is unable to perform any past relevant work.  Tr. 31.

7.    Thompson was born in 1978 and was 30 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 32.

8.    Thompson has at least a high school education and is able to communicate in English.  Tr. 32.

9.    Transferability of job skills is not material to the determination of disability.  Tr. 32.

10.   Considering Thompson's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Thompson can perform, including inspector, order clerk, and assembler. Tr. 32-33.

Based on the foregoing, the ALJ determined that Thompson had not been under a disability from July 1, 2008, through the date of the decision.  Tr. 33.

## V. Parties' Arguments

### A.    Plaintiff's arguments

Thompson presents two arguments in support of his request for reversal and remand. First, he argues that the ALJ's RFC finding is not supported by substantial evidence because the ALJ did not properly weigh the opinion evidence and/or explain how her RFC was supported by the opinion evidence.  Doc. 17, pp. 14-17.  More particularly, he argues that the ALJ did not properly weigh the opinion of his treating physician Dr. Blankenhorn who opined that Thompson had more severe limitations than those included in the ALJ's RFC.  Doc. 17, pp. 14-15 (referencing Tr. 508-509).  He also argues that the ALJ's RFC is not supported by the other opinion evidence.  Doc. 17, pp. 15-16.  He argues that, although the ALJ found that the opinion of the consultative examining physician Dr. Williams was entitled to "little weight" because

evidence received after he rendered his opinion justified more restrictive limitations, the ALJ's RFC was less restrictive than Dr. Williams' opinion.[27]  Doc. 17, pp. 15-16.

Second, Thompson argues that the ALJ erred in assessing Thompson's credibility.  Doc. 17, pp. 17-21.  He argues that the ALJ only discussed statements regarding his daily activities that diminish Thompson's credibility and ignored other statements about his daily activities that would show that he is unable to work.  Doc. 17, pp. 18-19.  He also argues that the ALJ did not properly consider his treatment and medication or work history record when assessing his credibility and incorrectly suggested that Thompson exaggerated his symptoms.  Doc. 17, pp. 19-20.

## B.      Defendant's arguments

In response, the Commissioner argues that the RFC is supported by substantial evidence and that the ALJ properly considered and weighed the medical opinion evidence.  Doc. 20, pp. 19-23.

The Commissioner also argues that the ALJ's credibility assessment is supported by substantial evidence and that, in assessing Thompson's credibility, the ALJ properly noted inconsistent statements and exaggerations and properly considered evidence of Thompson's daily activities in conjunction with the objective medical and opinion evidence.  Doc. 20, pp. 23-25.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

---

[27] Thompson also points out that the ALJ gave little weight to the state agency reviewing physicians' opinions who opined that Thompson could perform a full range of medium work because evidence received after they rendered their opinions justified a more restrictive RFC.  Doc. 17, p. 16.  Thus, he argues it remains unclear how the ALJ arrived at her RFC.  Doc. 17, p. 16.

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.    The ALJ properly considered and weighed the medical opinion evidence and the RFC is supported by substantial evidence**

"[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. Appx. 149, 157 (6th Cir. 2009).  The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ is to assess a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 404.1545(a); 404.1546(c); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC").

Thompson recognizes that it is the ALJ and not a physician who ultimately determines a claimant's RFC.  Doc. 17, p. 14.  However, he asserts that reversal and remand is warranted because the RFC is not supported by substantial evidence.  Doc. 17, pp. 14-17.  His argument is based on his claim that the ALJ did not properly weigh the opinions of Dr. Blankenhorn and Dr. Willliams and/or explain how her RFC was supported by the opinion evidence.  Doc. 17, pp. 14-17.

The ALJ determined that Thompson had the RFC to:

[P]erform sedentary  work as defined in 20 CFR 404.1567(a) and 416.967(a) except that claimant may occasionally climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid all exposure to workplace hazards, such as unprotected heights and dangerous moving machinery.

Tr. 27.

It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 404.1527.  20 C.F.R. § 404.1527(e)(2).  Those factors include the examining and/or treatment relationship, length, nature and extent of treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization. 20 C.F.R. § 404.1527(c)(1)-(6).

**1.  Dr. Blankenhorn**

With respect to the opinion of Dr. Blankenhorn, the ALJ stated,

Little weight is accorded the opinion of the claimant's treating source, Glenn Blankenhorn, D.O., that the claimant would be limited to the sedentary exertional level, could stand and/or walk no more than one-half hour in an eight hour workday and could sit no more than one hour in an eight hour workday, that the claimant could not climb, balance, stoop, crouch, kneel, crawl, push or pull, that the claimant could occasionally reach, should avoid all exposure to heights and extremes of temperature, would require additional rest periods and would require the option to sit or stand at will.  Dr. Blankenhorn examined the claimant and was reporting within the bounds of his professional certifications, yet the record reflects that he examined the claimant on a single occasion.  Dr. Blankenhorn's

opinion contained no narrative, offering no findings on which his opinion was based and his opinion was inconsistent with the essentially benign findings of his own physical examination.

Tr. 31.

Thompson argues that "[b]ecause the ALJ named Dr. Blankenhorn as a treating source, she was required to accord his opinion controlling weight if it was well-supported by medically acceptable clinical and laboratory diagnostic techniques not inconsistent with other substantial evidence in the record."  Doc. 17, p. 15.  Thompson's argument assumes that, because the ALJ called Dr. Blankenhorn a treating source, Dr. Blankenhorn was a treating source entitled to controlling weight under the "treating physician rule."

With respect to the "treating physician rule," the Sixth Circuit has stated that "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."[28] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2).

A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502.  The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id.*  "The

---

[28] If a treating source's opinion is not provided controlling weight, certain factors are to be applied by the ALJ to determine what weight should be given to the treating source's opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).  The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen*, 478 F.3d at 747; 20 C.F.R. §§ 404.1527(d), 416.927(d).

treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once . . . ." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). In those instances where a physician is not a treating source, *Wilson* has been found to be inapplicable. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *see also Kornecky*, 167 Fed. Appx. at 507; *see also Daniels v. Comm'r of Soc. Sec.*, 152 Fed. Appx. 485, 490 (6th Cir. 2005).

Although the ALJ referred to Dr. Blankenhorn as a "treating source," the ALJ specifically noted that Dr. Blankenhorn saw Thompson on only one occasion. Tr. 31. Thompson does not claim that he had an ongoing treatment relationship with Dr. Blankenhorn such that his opinion should be entitled to special deference. Nor does he provide any authority to support a claim that the ALJ's mere reference to Dr. Blankenhorn as a "treating source" elevated Dr. Blankenhorn's opinion to that of a treating physician entitled to special deference under the "treating physician rule." Accordingly, because Thompson's relationship with Dr. Blankenhorn did not to the level of an ongoing treatment relationship, the Court finds that, contrary to Thompson's argument, the ALJ did not violate the treating physician rule. *See Daniels*, 152 Fed. Appx. at 490-491 (noting that, even though the ALJ casually referred to a doctor as a treating source, the ALJ's failure to specifically address that doctor's opinion was not surprising because the doctor did not meet the requirements under the regulations to be defined as a treating physician); *see also Smith*, 482 F.3d at 876 (finding that doctors who had examined the claimant on a single occasion or treated claimant on a very limited basis did not constitute the type of ongoing treatment relationship contemplated by the "treating physician rule").

Thompson alternatively argues that, if Dr. Blankenhorn's opinion was not entitled to controlling weight, the ALJ was required to weigh the opinion using the factors set forth in 20 C.F.R. §§ 404.1527 and 416.927.[29]  Doc. 17, p. 15.  However, the ALJ did just that.  She considered the length of the treatment relationship, i.e., one visit.  Tr. 31.  She considered the supportability of the opinion, i.e., the opinion contained no narrative and offered no findings on which the opinion was based.  Tr. 31.  She considered the consistency of Dr. Blankenhorn's opinion with the record as a whole, i.e., his opinion was inconsistent with the essentially benign findings of his own physical examination.  Tr. 31.  The ALJ met her obligation to consider and weigh Dr. Blankenhorn's opinion and explain the reasons for providing little weight to that opinion.  Accordingly, the Court finds no error in the ALJ's consideration of and the weight provided to Dr. Blankenhorn's opinion.  Accordingly, reversal and remand is not warranted.

### 2.  Dr. Williams

With respect to Dr. Williams opinion, the ALJ stated,

> Little weight was accorded the opinion of the consultative physical examiner, Perry Williams, M.D., that the claimant could lift twenty five pounds occasionally and twenty pounds frequently, that the claimant could stand and/or walk four hours in an eight hour workday and could sit for six hours in an eight hour workday, that the claimant was markedly limited in his ability to push, pull or bend. Dr. Williams examined claimant and was reporting within the bounds of his professional certifications, yet evidence received subsequent to the rendering of this opinion, particularly the diagnostic imaging (14F/9), (19F/2) justifies the more restrictive limitations imposed.

Tr. 31.

The RFC restriction limiting Thompson to sedentary work is more restrictive than Dr. Williams' opinion, which would allow Thompson to perform work at the light level.  *Compare*

---

[29] Those factors include the examining and/or treatment relationship, length, nature and extent of treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization. 20 C.F.R. § 404.1527(c)(1)-(6).

20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . .") *with* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . .").[30]  However, Thompson argues that the ALJ should have also included other more restrictive limitations, including limitations for push/pull, bending and prolonged sitting, and/or should have provided a meaningful explanation to account for the apparent contradiction between the limitations in the RFC and the weight provided to the opinion evidence.[31]  Doc. 17, p. 16.

When determining an RFC, an "ALJ considers numerous factors . . . including the medical evidence, non-medical evidence and the claimant's credibility."  *See Coldiron*, 391 Fed. Appx. at 443.  The ALJ's decision makes clear that, when formulating Thompson's RFC, the ALJ considered both medical and non-medical evidence as well as Thompson's credibility.  Tr. 27-31.  Moreover, "t]he Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC".  *Id.* at 435.  Thus, Thompson's suggestion that, because the ALJ provided little weight to the various medical opinions, the ALJ's RFC cannot be deemed supported by substantial evidence (Doc. 17, pp. 14, 16), is without merit.

Further, although the ALJ, when discussing Dr. Williams' opinion, did not specifically state why he did not include Dr. Williams' stated restrictions for pushing/pulling, bending or prolonged sitting in the RFC, the ALJ's discussion of Dr. Blankenhorn's opinion demonstrates

---

[30] Additionally, the RFC is more restrictive than the opinions of the state agency reviewing physicians who opined that Thompson could perform medium work.  Tr. 364, 380.  The state agency reviewing physicians also opined that Thompson had no postural limitations, including stooping and crouching.  Tr. 365.

[31] Thompson also suggests that, because the ALJ provided little weight to the various medical opinions, the ALJ's RFC cannot be deemed to be supported by substantial evidence.  Doc. 17, pp. 14, 16.

that the ALJ implicitly determined that the evidence did not support those limitations.[32] *See*

*Vaughan v. Comm'r of Soc. Sec.*, 2013 WL 453275, * 11 (N.D. Ohio Jan. 7, 2013), *report and*

*recommendation adopted*, 2013 WL 453252 (N.D. Ohio Feb. 6, 2013) (recognizing that in the

Sixth Circuit, "an ALJ can consider all the evidence without directly addressing in his written

decision every piece of evidence submitted by a party . . . so long as his factual findings as a

whole show that he implicitly resolved any conflict." (quoting *Loral Defense Systems-Akron v.*

*N.L.R.B*, 200 F.3d 436, 453 (6th Cir. 1999)); *see also Karger v. Commissioner of Social Sec.,*

414 Fed. Appx. 739, 749, 753 (6th Cir.2011) (recognizing that, where the necessary evidence

and analysis is contained within the decision, it may be shown that an ALJ implicitly resolved

conflicts based on the ALJ's factual findings as a whole).  Thus, Thompson's argument that the

RFC conflicted with Dr. Williams' opinion and the ALJ failed to adequately explain why she did

not include limitations for pushing/pulling, bending and/or prolonged sitting is without merit.

     For example, Dr. Williams opined that Thompson was markedly limited in his ability to

bend or push/pull.  Tr. 375.  Similarly, Dr. Blankenhorn opined that Thompson could rarely or

never stoop or crouch and could rarely or never push/pull.  Tr. 508-509.  When discussing Dr.

Blankenhorn's opinion, the ALJ found that, among other limitations, Dr. Blankenhorn's stated

limitations of no pushing/pulling, stooping or crouching were unsupported by specific findings

and were inconsistent with the essentially benign findings of his own physical examination.  Tr.

31.   This discussion is sufficient to allow this Court to follow the ALJ's rationale for not

including Dr. Williams' marked limitations of no bending and/or no pushing/pulling.

     Thompson also argues that the ALJ should have accounted for limitations in prolonged

sitting.  However, he does not propose what that limitation should have been.  Moreover, when

discussing Dr. Blankenhorn's opinion, the ALJ explained that Dr. Blankenhorn's opinion that

---

[32] Even if the ALJ's discussion with respect to Dr. Blankenhorn's opinion is not a

Thompson would need a sit/stand option was unsupported by specific findings and were inconsistent with the essentially benign findings of his own physical examination.  Tr. 31. Again, the ALJ's discussion of Dr. Blankenhorn's opinion is sufficient to allow this Court to follow the ALJ's rationale for not including limitations in the RFC to account for "prolonged sitting."

Since the ALJ's decision makes clear why the ALJ did not include limitations in the RFC for pushing/pulling, bending and/or prolonged sitting, the Court finds that reversal and remand is not warranted.

**B.      The ALJ properly evaluated Thompson's credibility**

Thompson argues that the ALJ improperly discounted his credibility.  Doc. 17, pp. 17-21 Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms.  First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other

factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, 1996 WL 374186, at 3 (July 2, 1996).

"Tolerance of pain is a highly individual matter and a determination of disability based on pain by necessity depends largely on the credibility of the claimant." *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987) (quoting *Houston v. Secretary of Health and Human Services,* 736 F.2d 365, 367 (6th Cir.1984)).  Thus, since the ALJ had the opportunity to observe Thompson, her conclusions should not be easily dismissed. *Id.*; *see also Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)) ("An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility"). "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin*, 437 F. Appx. at  371.

In reviewing an ALJ's credibility determination, a court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record."  *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 476 (6th Cir. 2003).  The court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."  *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

When assessing the credibility of Thompson's allegations regarding the intensity, persistence and limiting effects of his back pain, the ALJ considered the case record and conducted a thorough credibility analysis and concluded that the limitations associated with his pain were not as severe as Thompson alleged. Tr. 27-31.

The ALJ considered the results of objective medical evidence and physical examinations. Tr. 28-29.  For example, the ALJ recognized that, while diagnostic testing provided support for Thompson's allegations of shooting, stabbing pain in his lower back, with numbness in his left leg, and an inability to lift anything, stand or sit too long, the record, when viewed as a whole, did not support Thompson's allegation that his impairment would be preclusive of all work.  Tr. 28.

Further, in accordance with the regulations, when reaching his conclusions with respect to the credibility of Thompson's alleged disabling pain, the ALJ considered Thompson's daily activities, including his ability to attend to his own personal hygiene and grooming, perform normal household chores,[33] drive, run errands, shop in stores, manage his own finances, walk for exercise, and read and watch television.  Tr. 29-30 (referencing Exhibits 3E (Tr. 233) and 6F (Tr. 346) and hearing testimony).  Tr. 29-30.  The ALJ indicated that, "[w]hile none of these activities, considered alone, would warrant or direct a finding of not disabled, when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity."  Tr. 30.   Additionally, the ALJ considered the fact that Thompson had engaged in other activities "which are difficult to correlate with the alleged intensity of the pain stemming from his impairment."  Tr. 29.  As examples, the ALJ noted that, on October 8, 2008, and December 10, 2008, Thompson reported to emergency room personnel that he had fallen off ladders.[34]  Tr. 29 (referencing Exhibit 12F/31 (Tr.411) and Exhibit 3F/1 (Tr. 311)).  Also, on September 26, 2010, Thompson reported to emergency room personnel that he aggravated his back condition when his six year old daughter

---

[33] The ALJ considered the fact that Thompson reported that he needed frequent breaks when performing household chores.  Tr. 29.

[34] On October 8, 2008, he reported having fallen from a ladder while trying to rescue a cat from a tree.  Tr. 411.  On December 10, 2008, he reported being on a ladder and slipping sideways about 8 feet and hitting the ladder on the way down.  Tr. 311.

jumped on him.  Tr. 29 (referencing Exhibit 13F/5 (Tr. 432)).  On February 23, 2011, Thompson

was at the emergency room after having moved heavy objects.  Tr. 29 (referencing Exhibit

15F/13 (Tr. 460)).

Additionally, the ALJ considered treatment other than medication used to relieve

Thompson's symptoms.  Tr. 29.  Thompson acknowledges that the ALJ considered this factor.

Doc. 17, p. 19.  However, he appears to suggest that, because Thompson tried so many different

types of treatment without relief, the ALJ should have concluded that Thompson's allegations

that his pain was completely disabling were fully credible.  Doc. 17, pp. 19-20.  The ALJ's

decision makes clear that the ALJ was aware of Thompson's treatment history and the steps he

had taken to try to relieve his pain but she nonetheless concluded that, based on the record,

Thompson's allegations that his symptoms were completely disabling were not fully credible.

For example, the ALJ noted that Thompson had tried spinal injections, however, surgery was not

recommended.  Tr. 29 (referencing Exhibit 21F/1 (Tr. 510)).  Additionally, the ALJ considered

that, although Thompson reported having undergone a course of physical therapy, no such

records were in the file. Tr. 29.   The ALJ also considered that Thompson had been discharged

from pain management.  Tr. 29 (referencing Exhibit 2F/9 (Tr. 295, April 16, 2008, treatment

note reflecting "broken pain contract.")).[35]

The ALJ considered Thompson's use of prescription medications and noted that

Thompson had reported no side effects.  Tr. 29 (referencing Exhibit 9E (Tr. 244)).   Thompson

acknowledges that, in one report, he reported no side effects from his medication (Tr. 244) but

argues that, in another report and during the hearing, he indicated that his medication made him

---

[35] The ALJ also referenced Exhibit 17F/14, a May 8, 2011, emergency room note indicating that Thompson reported
that Dr. Lynch was no longer treating him because Dr. Lynch stated "he can't help me anymore and I have to go to a
straight pain clinic for treatment." Tr. 499.  The ALJ indicated that the reason for Thompson's discharge from the
pain management practice was unspecified but noted that it had often been reported that Thompson had engaged in
drug seeking behavior.  Tr. 29 (referencing Exhibit 3F/1 (Tr. 331), Exhibit 4F/3 (Tr. 326), Exhibit 15F/9 (Tr. 456),
and Exhibit 18F/2 (Tr. 503)).

very tired (referencing Tr. 50, 261).  Thus, he asserts that the ALJ's credibility assessment is flawed.  However, as discussed below, the ALJ was aware of these inconsistent statements and factored that into her credibility assessment.

The ALJ also noted that Thompson had made inconsistent statements and indicated that, although his inconsistent statements may not have been the result of a conscious intention to mislead, they nonetheless suggested that information provided by Thompson might not be entirely reliable.  Tr. 30.  For example, on August 12, 2009, when asked about substance abuse, Thompson indicated, "I used in the past but I haven't in a long time."   Tr. 343.   However, the ALJ noted that, a few months earlier, Thompson had been incarcerated for possession of marijuana.  Tr.30 (referencing Exhibit 4E (Tr. 234)).  The ALJ also noted that Thompson had provided inconsistent statements regarding medication side effects.  Tr. 30 (referencing Exhibit 15E (Tr. 261) and Exhibit 9E (Tr. 244)).

Thompson also argues that the ALJ improperly suggested that he exaggerated his symptoms. Doc. 17, p. 20.  He asserts that Dr. Blankenhorn's opinion, which indicates that Thompson should only lift or carry 2 pounds frequently (Tr. 508) is consistent with Thompson's testimony that Dr. Blankenhorn told him not to lift anything weighing over 1 pound (Tr. 54).  While Dr. Blankenhorn's opinion reflects that he opined that Thompson was restricted to lifting/carrying 2 pounds frequently (from 1/3 to 2/3 of an 8-hour day), Dr. Blankenhorn also stated that Thompson could lift/carry up to 10 pounds occasionally (from very little up to 1/3 of an 8-hour day).  Tr. 508.  Moreover, in finding that the record suggested that Thompson has exaggerated his symptoms, the ALJ also pointed to an intake examination wherein the examiner referenced the fact that Thompson "catastrophized" about his physical conditions.  Tr. 30 (referencing Exhibit 5F/9 (Tr. 341)).   Thus, considering the record as a whole, it cannot be said

that the ALJ's finding that Thompson tended to exaggerate symptoms is not supported by substantial evidence.

Additionally, Thompson takes issue with the fact that the ALJ noted that his sporadic work history raised a question as to whether his continuing unemployment was in fact related to his impairment.  Doc. 17, p. 20.  Thompson does not argue that it was improper for the ALJ to have considered his past work history but claims that the record does not support the ALJ's finding that his work history was sporadic.  Doc. 17, p. 20.  More particularly, he asserts that the record shows that he posted earnings in every quarter but for 4 quarters in the 10 years preceding his alleged onset date.  Doc. 17, p. 20 (referencing Tr. 196-197).  Even assuming that Thompson's work history does support his claim that he worked in every quarter but 4 in the 10 years preceding his alleged onset date, the ALJ thoroughly analyzed and explained her assessment of Thompson's credibility, she did not limit her analysis to a single piece of evidence, and her assessment of Thompson's credibility was reasonable and supported  by substantial evidence.  *Jones*, 336 F.3d at 477 (Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ.").

Thompson also argues that the Commissioner's decision should be reversed and remanded because the ALJ did not discuss many of the factors contained in 20 C.F.R. §§ 404.1529(c) and 416.929(c).  Doc. 17, p. 20.  However, as shown above, the ALJ's credibility assessment includes discussion of many of the factors and is clearly explained.  Moreover, the regulations do not mandate a discussion of all of the relevant credibility factors; an ALJ may satisfy his obligations by considering most, if not all, of the factors.  *See Bowman v. Chater*, 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).

Here, the ALJ's decision is sufficiently clear to allow this Court to determine whether the ALJ conducted a proper credibility assessment and whether that determination is supported by substantial evidence.  Soc. Sec. Rul. 96–7p, 1996 WL 374186, at * 4.  Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Thompson's impairments is supported by substantial evidence.  Accordingly, Thompson's request to reverse and remand the Commissioner's decision on the basis of the ALJ's credibility assessment is without merit.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated:  June 30, 2014

_____
Kathleen B. Burke
United States Magistrate Judge